**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| SHIRETTA JUSTICE, | : | No. 17 EAP 2018 |
| | : | |
| Appellant | : | Appeal from the Order of |
| | : | Commonwealth Court entered on |
| | : | 11/14/2017 at No. 1439 CD 2016 |
| v. | : | reversing the Order entered on |
| | : | 07/19/2016 in the Court of Common |
| | : | Pleas, Philadelphia County, Civil |
| PENNSYLVANIA STATE POLICE | : | Division at No. 1729 September Term |
| TROOPER LOMBARDO, | : | 2014 |
| | : | |
| Appellee | : | ARGUED: December 6, 2018 |

**OPINION**

**JUSTICE DONOHUE**                                        **DECIDED: May 31, 2019**

Subject to certain exceptions, sovereign immunity shields Commonwealth employees acting within the scope of their duties from liability for tortious conduct. 1 Pa.C.S. § 2310; 42 Pa.C.S. §§ 8521-22. In this intentional tort action, a jury found that Pennsylvania State Police ("PSP") Trooper Joseph Lombardo ("Trooper Lombardo") was acting outside the scope of his employment based on his use of force in an incident following a routine traffic stop. Accordingly, Trooper Lombardo was unable to benefit from the protections of sovereign immunity and judgment was entered against him and in favor of Shiretta Justice ("Ms. Justice"). The trial court affirmed, denying Trooper Lombardo's post-trial motion for judgment notwithstanding the verdict ("JNOV") and a new trial.

On appeal, the Commonwealth Court reversed, concluding that Trooper Lombardo's conduct fell within the scope of his employment and remanded for the entry of JNOV in favor of Trooper Lombardo. As discussed in more detail herein, pursuant to the Restatement (Second) of Agency §§ 228-235 (hereinafter the "Restatement") whether Trooper Lombardo's actions were within the scope of employment depends on the nature of his job; how, when and why he acted as he did; and the extent to which the PSP might expect him to use force under the circumstances. This fact-intensive scope of employment inquiry was properly put to the jury. *See Orr v. William J. Burns Intern. Detective Agency*, 12 A.2d 25, 26 (Pa. 1940). Because the jury's determination was reasonably inferable from the facts, we hold that the Commonwealth Court erred in disturbing the verdict. *See id.*; *see also, generally, Birth Center v. St. Paul Companies, Inc.,* 787 A.2d 376, 384 (Pa. 2001). We reverse and remand to the Commonwealth Court to consider the trial court's denial of Trooper Lombardo's motion for a new trial.

## Procedural History and Background

Ms. Justice initiated this action against Trooper Lombardo for assault, battery, invasion of privacy, intentional infliction of emotional distress and false imprisonment/arrest.[1] Trooper Lombardo, through counsel assigned by the Office of General Counsel,[2] filed preliminary objections claiming he was protected from suit on

---

[1] Ms. Justice initially filed a complaint naming both Trooper Lombardo and the PSP as defendants. In an amended complaint, she removed the PSP as a party. She also withdrew her prior averment that Trooper Lombardo was acting within the course and scope of his employment during their November 27, 2013 encounter.

[2] Pursuant to administrative law governing the defense of suits against Commonwealth employees, "[r]egardless of the allegations made against the defendant, if it appears to the General Counsel … that the defendant's conduct giving rise to the cause of action was within the scope of his employment and a good faith exercise of his authority, the (continued…)

the basis of sovereign immunity. The trial court overruled these preliminary objections and the case proceeded to arbitration. The arbitration panel determined that Trooper Lombardo was acting outside the scope of his employment and awarded Ms. Justice $15,000 in damages. Trooper Lombardo appealed the arbitration award and filed an answer to Ms. Justice's amended complaint, once again asserting that sovereign immunity protected him from liability. Following discovery, Trooper Lombardo moved for summary judgment, again asserting the defense of sovereign immunity. The trial court denied his motion and a jury trial ensued.

The evidence presented at trial revealed the following. During the time period relevant to this matter, Trooper Lombardo was assigned to the PSP's Bureau of Patrol, Belmont Barracks, in Philadelphia. On the afternoon of November 27, 2013, the day before Thanksgiving, Trooper Lombardo was on duty, in uniform, patrolling the Schuylkill Expressway in a marked PSP vehicle. Ms. Justice was driving westbound on the Schuylkill with her nineteen-year-old step son, Chafi Carter ("Carter"), in the passenger seat. At some point, Ms. Justice noticed Trooper Lombardo's vehicle coasting alongside her. When he motioned for her to pull over, she complied.

---

(…continued)
Commonwealth, or its insurance company if there is coverage, will undertake the defense with an attorney of its choosing at its expense, and will indemnify the defendant for the expense of a judgment against him." 4 Pa. Admin. C. § 39.3(a). Trooper Lombardo would be entitled to indemnification by the Commonwealth for any judgment entered against him. *See id.*; *see also id.*, § 39.13(c)(1) (regarding requests for indemnification).

Ms. Justice testified that after pulling her over, Trooper Lombardo told her that she had a broken taillight and a suspended license.[3] After stating that he would have to tow her car, he walked away. When he returned to the car, he asked Ms. Justice if there was someone licensed who could come pick her up and drive her car off the road, in recognition that neither she nor Carter had a valid license. She replied that she would make those arrangements. Then, Trooper Lombardo "just threw [the citations] into [Carter's] lap."[4] Ms. Justice characterized Trooper Lombardo's demeanor as "rough." N.T., 3/11/2016, at 70-72.

Ms. Justice testified that, per her discussion with Trooper Lombardo, she contacted Carter's mother, who agreed to come meet them along with another licensed driver so that one of the drivers could drive Ms. Justice's car from the road. She told Trooper Lombardo that these other drivers were on their way and that it should not take them long to arrive. Trooper Lombardo again walked away. According to Ms. Justice, the next thing she knew, a tow truck was pulling up, even though Trooper Lombardo had not returned to her car to inform her that the plan was changing. She stated that she pleaded with Trooper Lombardo to let her friends take the car, indicating that they were very close at that point. According to Ms. Justice, Trooper Lombardo refused, instead telling her that he had changed his mind and instructed her to "get out of the vehicle or I'm going to forcibly remove you" from it. N.T., 3/11/2016, at 73. At that

---

[3] Ms. Justice testified that she was unaware at the time she was pulled over that her license was suspended and that Trooper Lombardo informed her that it had been suspended due to a late payment on a ticket. N.T., 3/11/2016, at 70-71.

[4] Although he advised Ms. Justice that he had pulled her over for a broken taillight, Trooper Lombardo issued Ms. Justice two tickets, one for driving without a license and another for failing to use a turn signal. *Id.* at 112.

point, she and Carter got out of the car and removed themselves to the embankment on the other side of the Jersey barrier to continue waiting. Sixteen seconds of audiovisual footage showing the tow truck parked in front of Ms. Justice's car, captured on Carter's cell phone, was introduced into evidence and played for the jury. *See* Justice's Exhibit 1 (Carter's Cellphone Video).

Ms. Justice testified that Trooper Lombardo then approached the embankment offering to give her a ride. When she told him she did not need a ride, he responded "so where's your ride?" She answered that her "ride should be pulling up any second." Trooper Lombardo then told her to get into his car. She refused, testifying that she "wasn't going to get in the car with him." N.T., 3/11/2016, at 74-75.

Ms. Justice's lawyer played additional audiovisual footage, captured by Carter's cellphone, to demonstrate to the jury what happened next. *See* Justice's Exhibit 1.[5] In addition to that footage, Ms. Justice testified:

> And next thing I know [Trooper Lombardo]'s jumping the embankment on me, wrestling me down. I'm screaming and crying at that point. I was very scared and not understanding what was happening or what was going on because, you know, I was just like taken back because his demeanor was like so nasty the whole time. And then he comes over and tries to give me a ride after he was so unsympathetic and asked, you know, what was happening. And, you know, I didn't feel comfortable getting in the car with him at that point because of his demeanor…. So he jumped me, wrestled me, twisted my arm behind my back, was trying to push me down to the ground, you know.

---

[5] This segment of footage, also admitted into evidence, was one minute and thirty-three seconds long.

N.T., 3/11/2016, at 75-76. Ms. Justice recounted that she was "screaming and twisting around" and "pleading with [Trooper Lombardo] and letting him know that he's hurting me and that I have kids." *Id*.

She continued:

> I'm thinking that he's going to hurt me or send me off to jail. And I'm asking him, "What are you doing? … What's going on here?" And eventually he was hurting me too much. He was being forceful and my arm was twisted way up my back. I just let him do what he wanted to do and put the handcuffs on me. And at which point he said, "If you calm down and stop acting like an animal," you know, that's the last thing I remember him saying. I'm like, "an animal? Sir, what's going on here? You have me in handcuffs. I told you my ride is coming. I'm not understanding." Next thing I know, here comes [my ride] pulling up. I said, "I told you my ride was here."

*Id*.[6] Trooper Lombardo then took the handcuffs off and walked away, while Ms. Justice and Carter got in the back of the car that had come to retrieve them, "quiet and defeated." *Id*. at 76.

Ms. Justice testified that Trooper Lombardo never explained why he was placing her in handcuffs or why she needed to get into his police vehicle. *Id*. She explained that this was the reason she can be heard on the video asking Trooper Lombardo "why are you doing this?" as she did not understand why he was "jumping at" her and placing her in handcuffs. He did not explain his actions and "[h]e wasn't placing me under arrest. [H]e didn't read me any rights. I just didn't understand what he was doing." *Id*. at 80. She stated that the entire episode, including the traffic stop and the ensuing events,

---

[6] Carter can be heard asking Trooper Lombardo "What's she getting arrested for? Why can't we stand here? [and] … Why [do] you care about what's she's doing now?" *See* Justice's Exhibit 1.

lasted about forty minutes or less, and that she never cursed or used obscene gestures during this time. Afterward, she felt "embarrassed, humiliated, disrespected, victimized, afraid." *Id.* at 81. Moreover, her arm, wrists and back were hurting as a result of how Trooper Lombardo handled her. *Id.*

On direct examination, Trooper Lombardo testified that his general duties as a patrol trooper in 2013 were to go out on patrol and investigate crimes, to assist people in need, and to enforce the Motor Vehicle and Crimes Codes of Pennsylvania. Regarding his encounter with Ms. Justice on November 27, he stated that he informed Ms. Justice that a tow truck would be coming after she "snapped at me" that she had not arranged for anyone to drive her car off the expressway. *Id.* at 112. He also testified that Ms. Justice refused to take the tickets from him so he dropped them "on the center console or her passenger" before returning to his patrol car to await the tow truck. *Id.* at 113.

According to Trooper Lombardo, when the tow truck arrived, he informed Ms. Justice that she would need to get out of her vehicle and she refused, "cursing me up and down." *Id.* at 113. He also testified that he threatened to physically remove Ms. Justice from her car if she did not get out. When she did exit the vehicle, she again "curs[ed] me up and down." He characterized Ms. Justice's behavior as an "onslaught … it was a disgrace, especially coming from a woman. I was taken back by it." *Id.* at 114. He also stated that he felt like Ms. Justice "was causing him a hard time" when she took time to retrieve her belongings from her car. Trooper Lombardo testified that he then asked Ms. Justice "if she was coming with [him] so [he could] take her off the

highway to a safe location," at which point she continued to curse at him, stating she would not go into his patrol car and then climbed over the Jersey barrier. *Id.*

Trooper Lombardo testified that he did not believe Ms. Justice's ride was actually nearby. He also stated that he believed it was unsafe for Ms. Justice to wait behind the Jersey barrier for her ride and that all he wanted to do was get her into his car to take her to a safe place. He testified that he told her several times that "we need to get off the highway" and that she ignored him and was uncooperative. *Id.* at 117. It was only then that he "went over to the other side of the barrier … [and] grabbed her arm to bring her back to my car so we could get off the highway." *Id.* According to Trooper Lombardo, when he jumped the barrier, Ms. Justice started to fight with him and resist. He testified that he "just wanted to get control of the situation and put her in handcuffs to put her in the back of my car because everyone who goes in my car gets in handcuffs. It's a safety issue." *Id.* He further testified that when Ms. Justice's ride arrived, he took off the handcuffs and allowed her to go with her friend because his only objective was to get her off the highway.

When asked why he did not drive away once Ms. Justice and Carter were out of Ms. Justice's car and on the far side of the Jersey barrier, Trooper Lombardo stated that he thought it would have been "irresponsible as a police officer if you just tow somebody's car [and] leave them on the side of one of the busiest highways in … America." *Id.* at 121. He continued that, "if you come in contact with someone on the highway, you take them off the highway for their safety," and that goes for someone whose car has been towed as well. *Id.* at 121-22. "You're not just going to leave them

on the side of the highway. I was trained to take this person to a place of safety and that is all I wanted to do." *Id.* at 122.

On cross-examination, Trooper Lombardo conceded that neither of Carter's cellphone videos that were played for the jury contained footage of Ms. Justice cursing at him, and that he had not mentioned her cursing in his prior deposition testimony. *Id.* at 132-35. Trooper Lombardo acknowledged that he never directed Carter to get into his patrol car and made no attempt to handcuff Carter, although he testified that he intended to do so after restraining Ms. Justice. *Id.* at 141. Trooper Lombardo admitted that the videos do not show him telling Ms. Justice that it was unsafe for her to wait for her ride behind the barrier. He also admitted that he never gave Ms. Justice any explanation for why he was handcuffing her and never told her about any policy requiring him to remove her from the highway. He further acknowledged that he never charged Ms. Justice with any criminal violations such as resisting arrest or disorderly conduct. *Id.* at 160.

When questioned about the area where Ms. Justice and Carter were waiting for their ride, Trooper Lombardo testified that they were behind a barrier that was approximately three and a half feet tall and that no one could legally drive in that area. He confirmed that his patrol car was parked on the shoulder in between a lane of traffic and the Jersey barrier, and conceded that if someone standing on the far side of the barrier were to be hit by a car, it would not be the fault of the person waiting behind the barrier. The jury also heard Trooper Lombardo testify that there was a camera taking video footage from his patrol car on November 27, 2013, because the camera turns on whenever a trooper activates a patrol car's emergency lights, and that he was certain

the camera was running at the time of his encounter with Ms. Justice. *Id.* at 136. When questioned as to why he never turned this footage over to Ms. Justice's lawyer, Trooper Lombardo testified that it had been automatically deleted forty-five days after the incident, noting that this was standard operating procedure absent a need to preserve it. *Id.* Trooper Lombardo testified that Ms. Justice's complaint came in forty-five days after the incident "which means the video would be erased." *Id.*, at 136. It was otherwise uncontested, however, that Ms. Justice filed a written complaint at Belmont Barracks within six days after the incident.

Finally, Corporal Derek Watford ("Corporal Watford") of the PSP testified in Lombardo's defense regarding certain rules governing the conduct of PSP troopers on patrol. *Id.* at 178-187. He testified that if a car must be removed from the highway under circumstances where the driver is not being taken into custody, "no one should be left on the side" of the road. Furthermore, he stated that it is proper for a trooper to transport a person from the highway to a place of safety, and that "anybody that's transported in a [PSP] car shall be searched, patted down for weapons and handcuffed for the safety of the member as well as the individual being transported." *Id.* at 179. He testified that the PSP's Field Regulations Manual ("FRM"), section 7-2, titled "Prisoner Security and Transportation," sets forth the foregoing policy, citing subsection 2.03 in particular. He also stated that every trooper is instructed on handcuffing during their time in PSP Academy. Although he testified that troopers are instructed not to leave people on the side of a highway, he stated that this was "a matter of safety," but that "no specific regulation" exists in this regard. *Id.* at 182.

On cross-examination, Corporal Watford conceded that subsection 2.03 of the FRM relates only to "prisoner searches" and does not contain any language about how troopers are supposed to treat non-prisoner motorists whose vehicles have been impounded. He testified, however, that he would characterize a motorist who is transported in a police vehicle as a prisoner, because "if I put you in my vehicle, you can't exit. The doors lock. So, in essence, you're a prisoner. You can't get out of the vehicle without us releasing you." *Id.* at 184. Upon questioning by the trial court, Corporal Watford indicated that there are circumstances under which he would not handcuff someone he found on the side of the highway (for example, if the individual were the victim of a violent crime). While emphasizing section 7-2's focus on trooper safety, Corporal Watford could not point to any provision authorizing a trooper to handcuff the occupants of a towed car for the purpose of removing them from the side of the highway, or for any other purpose. *Id.* at 186-87.

At the close of trial, the trial court presented the following jury instruction on scope of employment:

> If [Trooper Lombardo's] actions on November 27, 2013, were within the scope of his employment, then [Ms. Justice] will not recover. It is for you to decide whether [Trooper Lombardo] at the time of the occurrence was acting within the scope of his employment. Any employee is acting within the scope of his employment where such act is in furtherance of the employer's interests, activities, affairs, or business, or is designed to accomplish the purpose of the employment. It is not necessary that the act or omission had been specifically authorized as long as it could reasonably be found to have been contemplated as part of the employment.
>
> An employee is not acting within the scope of his or her employment when he or she departs or substantially deviates from the business or services of his employer

pursuing some personal activity on his own account and not reasonably embraced within this employment or not directed towards advancing his employer's interest.

The conduct of an employee is considered to be within the scope of employment if, one, it is of a kind and nature that the employee is employed to perform. Two, it occurred substantially within the authorized time and space limits. Three, it is actuated at least in part, by a purpose to serve the employer. And, four, if force is intentionally used by the employee against another, the use of force for the particular circumstances is not unexpected by the employer.

An assault committed by an employee upon another for personal reasons or in an outrageous manner is not actuated by intent to perform the business of an employer, and as such, is not within the scope of employment.

N.T., 3/14/2016, at 49-51.[7]

The jury returned a verdict in favor of Ms. Justice in the amount of $160,000. On March 17, 2016, Trooper Lombardo filed post-trial motions seeking a new trial or JNOV on the basis that he was acting within the scope of his employment and was therefore protected from liability by sovereign immunity. On July 19, 2016, the trial court denied Trooper Lombardo's motions and entered judgment. Trooper Lombardo appealed. In a written opinion, the trial court indicated that there was inconsistent evidence presented at trial as to which "reasonable minds could differ about the facts." Trial Court Opinion, 12/6/2016, at 5. Moreover, "because the determination of whether [Trooper Lombardo] was acting outside the scope of his employment during his interaction with [Ms. Justice] was in the sole province of the jury as the finders of facts," the trial court held that

---

[7]  Trooper Lombardo objected to the last sentence of this scope of employment instruction. N.T., 3/14/2016, at 61.

denying JNOV was not error and advocated that the entry of judgment against Trooper Lombardo should be affirmed. *Id.* at 7.

The Commonwealth Court reversed, agreeing with Trooper Lombardo that he was protected from liability for the intentional tort claims against him because he acted within the scope of his employment when handcuffing Ms. Justice following the traffic stop. *Justice v. Lombardo*, 173 A.3d 1230, 1239 (Pa. Commw. 2017). The Commonwealth Court observed that, to be within the scope of employment, an employee's conduct must be of the "same general nature as that authorized, or incidental to the conduct authorized." *Id.* (quoting Restatement (Second) of Agency § 229(1)). In this regard, the Commonwealth Court concluded that because the PSP had directed Trooper Lombardo to enforce laws regulating the use of highways and to make warrantless arrests for violations thereof, Trooper Lombardo's handcuffing of Ms. Justice, being "in the nature of or incidental to" such authorized conduct, was necessarily within the scope of his employment. *Id.* (citing 71 P.S. §§ 250(g), §252(a)).

Discussing section 228(1) of the Restatement, the intermediate appellate court also noted that "if force is intentionally used by the employee against another," it must be "not unexpected by the employer." *Id.* at 1238. In concluding that Trooper Lombardo's use of force was not unexpected, the Commonwealth Court reasoned that because the PSP empowers Trooper Lombardo to use force when enforcing laws and making warrantless arrests, "the use of force, in general, by [s]tate [t]roopers is not unexpected." *Id.* at 1239. Finally, based on the authorized and "not unexpected" nature of Trooper Lombardo's actions, the Commonwealth Court held that it was irrelevant to the scope of employment analysis whether Trooper Lombardo's conduct was

"reasonable or not, intentional or not, tortious or not, carried out for an improper motive or not." *Id.*[8] We granted allowance of appeal to decide whether Trooper Lombardo was "acting within the scope of his employment throughout his entire encounter with the motorist, and thus entitled to JNOV on the basis of sovereign immunity." *Justice v. Lombardo*, 187 A.3d 206 (Pa. 2018) (per curiam).

## Discussion

In accordance with 1 Pa.C.S. § 2310, "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa.C.S. § 2310. Our intermediate

---

[8] Because the Commonwealth Court granted JNOV, it did not reach the issues raised regarding Trooper Lombardo's motion for a new trial. *Justice*, 173 A.3d at 1239 n.11. In arguing for a new trial, Trooper Lombardo contended that the trial court erred by precluding him from presenting any evidence about the progress of the PSP's investigation into his conduct, including the PSP's conclusion that he acted in compliance with PSP regulations. In its opinion, the Commonwealth Court improperly relied on this excluded evidence. Although aware that the evidence was excluded, the Commonwealth Court set forth, verbatim, the content of a letter to Ms. Justice explaining the conclusions of the PSP. *Id.* at 1232.

As further basis for a new trial, Trooper Lombardo claimed the trial court erred by requiring Trooper Lombardo to follow Ms. Justice's lawyer's request to read out loud into evidence sections of the Philadelphia Police Department Citizen Information Bulletin Number 2 concerning Live Stops in Philadelphia; by not using the Standard Pennsylvania Practice jury instruction on scope of employment that he had submitted, replacing it instead with a jury instruction that he argued misstated applicable law and was misleading; by affirming an award of damages so excessive that it appears to have been based on prejudice or passion; and by instructing the jury that a minimum of six of eight jurors must agree on their answers to each question. Trial Court Opinion, 12/6/2016, at 3-4. We observe that while the trial court concluded that Trooper Lombardo had waived any challenge to the scope of employment instruction by failing to object to it during a sidebar discussion after the court had charged the jury, *id.* at 14, Trooper Lombardo's attorney did in fact object to the final sentence of the scope of employment instruction. *See supra*, note 7.

appellate courts have held that these protections shield an employee of a Commonwealth agency from the imposition of liability even for intentional torts.[9] *See La Frankie v. Miklich,* 618 A.2d 1145, 1149 (Pa. Commw. 1992). In the present case, it is undisputed that Trooper Lombardo, as an employee of the PSP, is entitled to the protections of sovereign immunity for conduct within the scope of his duties, subject only to certain exceptions not applicable here.[10] *See* 1 Pa.C.S. § 2310; *see also* 42 Pa.C.S. §§ 8521, 8522(b)(1)–(9); *La Frankie,* 618 A.2d at 1149. Thus, judgment could only be entered against Trooper Lombardo in this matter if he was acting outside the scope of employment on November 27, 2013 when he initiated a physical encounter with Ms. Justice and forcibly handcuffed her. *See id*.

Section 228 of the Restatement provides:

> (1) Conduct of [an employee] is within the scope of employment if, but only if:
>
> > (a) it is of the kind he is employed to perform;
> >
> > (b) it occurs substantially within the authorized time and space limits;
> >
> > (c) it is actuated, at least in part, by a purpose to serve the [employer], and

---

[9] Unlike local agency employees, governed by the Political Subdivision Tort Claims Act, 42 Pa.C.S. §§ 8541-8560, the Commonwealth Court has held that Commonwealth employees retain sovereign immunity protection even for claims of alleged willful misconduct. *Compare Renk v. City of Pittsburgh*, 641 A.2d 289, 292 (Pa. 1994) (citing 42 Pa.C.S. § 8550), *with Kull v. Guisse,* 81 A.3d 148, 154 n.5 (Pa. Commw. 2013).

[10] The exceptions to sovereign immunity include: vehicle liability; medical-professional liability; care, custody, or control of personal property; Commonwealth real estate, highways, and sidewalks; potholes and other dangerous conditions; care, custody, or control of animals; liquor store sales; National Guard activities; and toxoids and vaccines. 42 Pa.C.S. § 8522(b)(1)–(9).

(d) if force is intentionally used by the [employee] against another, the use of force is not unexpectable by the [employer].

Restatement (Second) of Agency § 228(1) (1958).[11] On the other hand, an employee's conduct "is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.*, § 228(2).

Subsequent sections of the Restatement provide additional criteria for assessing whether conduct falls within the scope of employment. *See e.g., id.*, §§ 229-31, 235. Section 229 provides that "to be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to that authorized." *Id.*, § 229(1). It also enumerates ten "matters of fact" to be considered in determining whether or not conduct, although unauthorized, is nevertheless so similar to or incidental to the conduct authorized that it is still within the scope of employment. *Id.*, § 229(2). Pursuant to section 230, "an act, although forbidden, or done in a forbidden manner, may be within the scope of employment." *Id.*, § 230. Section 231 provides that "an act may be within the scope of employment although consciously criminal or tortious." *Id.*, § 231. Pursuant to section 235, "an act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." *Id.*, § 235.

By its terms, the Restatement sets forth parameters governing the potential vicarious liability of employers for the tortious acts of their employees in scenarios

---

[11] The jury instructions provided at trial in the case at bar included section 228(1) of the Restatement verbatim. *See supra* pp. 11-12.

where neither sovereign nor local government immunity applies. In such instances, the plaintiff carries the burden of proving that an employee acted **within** the scope of employment. If he prevails, he may recover damages from the employer. *See Lunn v. Boyd*, 169 A.2d 103, 105 (Pa. 1961); *Howard v. Zaney Bar*, 85 A.2d 401, 403 (Pa. 1952); *Orr*, 12 A.2d at 26-27. By contrast, in the context of sovereign immunity, where the Commonwealth itself is shielded from vicarious liability, a finding that the employee acted within the scope of employment precludes a plaintiff from recovering at all. Moreover, because sovereign immunity is an affirmative defense, *Schell v. Guth*, 88 A.3d 1053, 1068 (Pa. Commw. 2014), the defendant carries the burden at trial of proving that his conduct was within the scope of his employment. *See generally Reott v. Asia Trend, Inc.*, 55 A.3d 1088, 1095-96 (Pa. 2012) (party asserting affirmative defense bears burden of proof on that defense at trial); *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) (same).

This Court has adopted the Restatement's scope of employment analysis in vicarious liability cases. *See Howard*, 85 A.2d at 403. And despite the somewhat awkward application of it to establishing the defense of sovereign immunity, our intermediate appellate courts have regularly applied the Restatement in this latter context as well. *See, e.g., Schell*, 88 A.3d at 1068. Absent any argument from the parties that another standard governs in cases involving the application of sovereign or governmental immunity, we rely on this Court's vicarious liability cases and on the language of the Restatement itself in analyzing whether Trooper Lombardo acted within

the scope of employment and may therefore benefit from sovereign immunity in the present case.[12]

We have long held that whether a particular act of an employee is within the scope of his employment is ordinarily a question of fact for the jury. *Orr*, 12 A.2d at 27; *Brennan v. Merchant & Co., Inc.*, 54 A. 891, 892 (Pa. 1903) (citing *Guinney v. Hand*, 26 A. 20 (Pa. 1893)). We have explained that the only exception to this well-established rule is where neither the facts nor the inferences to be drawn from them are in dispute. *Orr*, 12 A.2d at 27 (citing *Brennan*, 54 A. at 892). In such a case, the court may decide the scope of employment question as a matter of law. *Brennan*, 54 A. at 892. However, where more than one inference may be drawn from the facts, the issue of whether an employee was acting within the scope of employment is for the jury. *See Iandiorio v. Kriss & Senko Enterprises, Inc.*, 517 A.2d 530, 534 (Pa.1986).

As described in our overview of the evidence, this incident evolved from a valid traffic stop. Ms. Justice was stopped by Trooper Lombardo on the Schuylkill Expressway for a broken taillight (or for her failure signal when changing lanes) and for driving without a valid license. She was ticketed for two violations of the Motor Vehicle Code. There is no dispute that she could not drive the vehicle from the scene of the traffic stop or that her nineteen-year-old stepson, who was unlicensed, also could not drive the vehicle from the scene. While the timing of Trooper Lombardo's decision to call a tow truck may be suspect (given his suggestion that Ms. Justice arrange for

---

[12] We observe at the outset that because all four prongs of section 228(1) must be satisfied for the conduct to be within the scope of employment, if a jury could reasonably find that any one of the four is not established, the conduct may be considered outside the scope of employment.

friends to drive the vehicle from the scene), it is clear that he had the authority to call for a tow. And whether or not Ms. Justice and Trooper Lombardo were cordial with each other when he told her to exit her vehicle so that it could be towed is ultimately only tangentially relevant to the resolution of this matter.

At its core, the conduct of Trooper Lombardo that forms the basis for the tort action decided by the jury is that which occurred after Ms. Justice removed herself to the side of the Jersey barrier farthest from the travelled lanes of the Schuylkill Expressway and the use and degree of force by Trooper Lombardo in handcuffing her under the circumstances. As discussed, this case involves a type of evidence becoming more prevalent, namely, that resulting from a citizen utilizing a cellphone to capture audio and video of occurrences in real time. The jury in this matter was presented with both testimonial evidence of the incident in question and an audiovisual recording of the same events. Just as determinations about the credibility of testimony are in the province of the jury, so too is the interpretation of the audiovisual recording of the incident.

This case comes to us following the Commonwealth Court's reversal of the trial court's denial of JNOV. We review the Commonwealth Court's legal conclusions de novo. An appellate court will reverse the trial court's decision to grant or deny JNOV only when it finds an abuse of discretion or an error of law. *See Rost v. Ford Motor Company*, 151 A.3d 1032, 1042 (Pa. 2016) (citing *Reott*, 55 A.3d at 1093). In reviewing the lower court's decision, we must read the record in the light most favorable to the verdict winner and afford her the benefit of all reasonable inferences. *Moure v.*

*Raeuchle*, 604 A.2d 1003, 1007 (Pa. 1992). Our scope of review is plenary. *Reott*, 55 A.3d at 1093.

A court may enter JNOV on one of two bases. The first is where a movant is entitled to judgment as a matter of law because, upon reviewing the record and deciding all factual inferences adverse to the movant, the law nonetheless requires a verdict in his favor. *Moure,* 604 A.2d at 1007. The second is where "the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Id*.; *see also Birth Center*, 787 A.2d at 383. In such a case, the court reviews the evidentiary record and concludes based on the evidence that a verdict for the movant was beyond peradventure. *Moure*, 604 A.2d at 1007.

Thus, we may conclude that the denial of JNOV was inappropriate only if there is insufficient, competent evidence to sustain the verdict. *Wenrick v. Schloemann-Siemag Aktiengesellschaft*, 564 A.2d 1244, 1246 (Pa. 1989). Here, because Ms. Justice prevailed at trial, we give her the benefit of every reasonable inference arising from the evidence, while rejecting all unfavorable testimony and inferences. Moreover, JNOV should only be entered in a clear case with any doubts resolved in favor of the verdict winner. While the court may disagree with a verdict, it may not grant a motion for JNOV simply because it would have come to a different conclusion. Indeed, the verdict must stand unless there is no legal basis for it. *Birth Center*, 787 A.2d at 383.

The Commonwealth Court stated that in reaching its conclusion that Trooper Lombardo was entitled to JNOV, it followed the legal principle just recited, namely that it viewed all of the evidence in the light most favorable to Ms. Justice. *Justice*, 173 A.3d at 1239. Although not stated, we must presume that the Commonwealth Court

concluded, upon applying this standard, that the law nonetheless required a verdict in favor of Trooper Lombardo.[13]

We now summarize the previously detailed evidence in the light most favorable to Ms. Justice to test the Commonwealth Court's holding that, as a matter of law, Trooper Lombardo was acting within the scope of his employment. While Ms. Justice and her stepson were waiting for their ride behind the three-and-a-half-foot tall Jersey barrier, removed from the travelled lanes of the highway, Trooper Lombardo aggressively jumped over the barrier wielding his handcuffs. He forcibly wrestled Ms. Justice into handcuffs for the purpose of involuntarily removing her from behind the protection of the barrier so that she could be transported elsewhere. He engaged in this conduct instead of allowing her to wait for the private transportation he had encouraged her to arrange. Ms. Justice was not under arrest for any crime and was not being detained because of suspicion of criminal activity. Moreover, she specifically refused Trooper Lombardo's offer to transport her.

The Commonwealth Court's rationale for concluding that this evidence required a JNOV is flawed. Ignoring the specific evidence offered by Trooper Lombardo to define what conduct is authorized, the Commonwealth Court reasoned that Trooper Lombardo's use of force was within the scope of his employment because it was "incidental to" his authority to regulate the highways and make warrantless arrests. *Justice*, 173 A.3d at 1239. That court also concluded, as Trooper Lombardo likewise

---

[13] The alternative basis for the grant of a JNOV requires that "the evidence was such that no two reasonable minds could disagree" that the verdict should have been entered by the jury in favor of Trooper Lombardo. *See supra* p. 20. Given the highly divergent evidence of the encounter between the parties, this basis is facially inapplicable.

contends on appeal to us, that because PSP troopers are generally authorized to use force to "carry out those purposes," any use of force by a trooper (including Trooper Lombardo's wrestling and handcuffing of Ms. Justice) was not unexpected. *See id.*; *see* Lombardo's Brief at 33 (citing 18 Pa.C.S. § 508 and discussing cases).

Contrary to the Commonwealth Court's pronouncements, the Restatement's guidance that an employee's unauthorized conduct may be within the scope of employment if it is of "the same general nature as" or "incidental to" some authorized conduct is not a catchall intended to give legal cover to all manner of unsanctioned behavior. Moreover, it is simply not the law that an employee's use of force is within the scope of employment regardless of whether the force is reasonable or carried out for an improper motive. *See* Restatement (Second) of Agency § 228(1)(c). The Commonwealth Court's approach results in an expansive new rule pursuant to which essentially any use of force by a trooper is within the scope of employment even if it occurs, as here, after the completion of a traffic stop and unrelated to any arrest for the violation of any law. Indeed, the intermediate appellate court's holding would usurp scope of employment inquiries from the jury in virtually all cases involving the use of force by a PSP trooper whose conduct, no matter how egregious, occurred while he or she was on duty and in uniform. According to that court, because a trooper is authorized to use force in certain circumstances, he is necessarily acting within the scope of his employment anytime he uses force, regardless of the degree or reason for using it. This is a misstatement of the law.

We decline to hold that wrestling Ms. Justice into handcuffs was, as a matter of law, "incidental to" Trooper Lombardo's duty to enforce highway regulations or make

warrantless arrests. By logical extension, we also disagree with the Commonwealth Court and Trooper Lombardo that his use of force was not unexpected simply because, under entirely different circumstances, a PSP Trooper might be permitted to use force. *See* 18 Pa.C.S § 508 (relating to an officer's use of force in making a **lawful arrest**).[14] Thus, we hold that the Commonwealth Court erred in reversing the trial court's denial of JNOV.[15]

---

[14] In pertinent part, section 508 of the Crimes Code provides:

> (a) Peace officer's use of force in making arrest.--
>
> (1) A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest. However, he is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person, or when he believes both that:
>
> (i) such force is necessary to prevent the arrest from being defeated by resistance or escape; and
>
> (ii) the person to be arrested has committed or attempted a forcible felony or is attempting to escape and possesses a deadly weapon, or otherwise indicates that he will endanger human life or inflict serious bodily injury unless arrested without delay.
>
> (2) A peace officer making an arrest pursuant to an invalid warrant is justified in the use of any force which he would be justified in using if the warrant were valid, unless he knows that the warrant is invalid.

18 Pa.C.S. § 508(a).

[15] In an approach similar to the Commonwealth Court's, the Dissent posits that section 3102 of the Vehicle Code provides a basis for finding that Trooper Lombardo acted (continued…)

Resolution of this matter was properly put to the jury. Based on our review of the record, and resolving all disputed evidence in favor of Ms. Justice as the verdict winner, the jury could have concluded under the circumstances of this case that Trooper Lombardo's use of force, including wrestling and forcibly handcuffing Ms. Justice, was not within the scope of his employment. As discussed, there was sufficient competent evidence upon which the jury could find that Trooper Lombardo's use of force was neither of the kind he was employed to perform nor incidental thereto. This same evidence could also support a finding that the PSP would not have expected Trooper Lombardo to use force under the circumstances present in this case.

Based both on testimony and cellphone footage of the incident, it was reasonable for the jury to conclude that Trooper Lombardo lacked any cause or suspicion whatsoever that Ms. Justice was committing or about to commit any crime when she and Carter were standing behind the Jersey barrier. He does not now argue to the contrary, nor did he testify at trial that he suspected criminal activity, reasonably or otherwise. As Trooper Lombardo acknowledged, Ms. Justice was never charged with, let alone convicted of, any offense that might justify handcuffing, especially at the time in question. *See* N.T., 3/11/2016, at 160.

---

(…continued)

within the scope of his employment when he wrestled and handcuffed Ms. Justice. Dissenting Op. at 4. That provision relates to "obedience to authorized persons directing traffic." 75 Pa.C.S. § 3102(1). Trooper Lombardo was not directing traffic at any point after initially signaling Ms. Justice to pull over to the side of the highway. To the contrary, during the incident in question, his PSP vehicle was parked on the shoulder of the highway, Ms. Justice's car had already been towed, and he and Ms. Justice were standing off the highway behind the Jersey barrier, well beyond the flow of traffic. Accordingly, this provision has no bearing on Ms. Justice's refusal to comply with Trooper Lombardo's order or directive to get into his car and certainly does not bring his use of force within the scope of his employment as a matter of law.

Even assuming arguendo that the jury intuitively understood that handcuffing someone pursuant to a **valid arrest** is conduct a trooper is employed to perform, and that the PSP might expect troopers, including Trooper Lombardo, to employ force in some scenarios as they carry out their legitimate patrol duties, it was reasonable for the jury to conclude that Trooper Lombardo's intentional use of force upon Ms. Justice, who waited for a ride behind a three-and-a-half foot high concrete barrier removed from the roadway, departed drastically from such authorized and expectable conduct.[16]

Moreover, there was no evidence that would require a jury to conclude that the use of force is sanctioned for the purported purpose of protecting a citizen from a disputable safety threat at the side of the highway. When questioned about the proper PSP procedure to follow after towing a car from the highway, Trooper Lombardo testified that he had been trained to drive the occupants of the towed car to a place of safety. N.T., 3/11/2016, at 122. Similarly, Corporal Watford testified that "no one should be left on the side" of the road as a matter of safety.[17] Even if the jury credited

---

[16] Trooper Lombardo urges us to follow the federal district court's pronouncement in *Ickes v. Grassmeyer*, 30 F.Supp.3d 375, 399 (W.D. Pa. 2014), that "given the nature of police work, it is reasonably expected that officers conducting a traffic stop may use force in certain circumstances." Lombardo's Brief at 31-32. Analyzing a Pennsylvania state law assault and battery claim brought against PSP troopers at the motion to dismiss stage, the *Ickes* court concluded that the troopers were acting within the scope of their employment when, following a routine traffic stop during which Ickes declined to get out of his car, the troopers smashed Ickes' window, pulled him from the driver's seat, dragged him over broken glass and tightly cuffed his hands behind his back. Ickes was subsequently convicted of resisting arrest and other violations arising out of that incident. *Ickes*, 30 F.Supp.3d at 379, 399. We find *Ickes* unpersuasive since, unlike the case before us, *Ickes* involved a lawful arrest. Unlike the present case, *Ickes* also involved a Fourth Amendment excessive force claim pursuant to 42 U.S.C. § 1983 as well as other constitutional claims.

[17] Furthermore, contrary to Trooper Lombardo's assertion that "it cannot be gainsaid" that Ms. Justice faced a threat to her safety, the jury was free to conclude otherwise (continued…)

this testimony, when questioned about Trooper Lombardo's authority to handcuff someone like Ms. Justice, who was not suspected of having committed any crime and needed transportation only because her car had been impounded, Corporal Watford did not invoke general PSP practice, but rather relied upon a specific PSP regulation. In particular, after indicating that "anybody that's transported in a [PSP] car shall be searched, patted down for weapon and handcuffed for the safety of the member as well as the individual being transported," N.T., 3/11/2016, at 180, Corporal Watford testified that section 7-2 of the PSP's FRM, including its subsection 203(A), authorized Trooper Lombardo's handcuffing of Ms. Justice.

However, the subsection to which Corporal Watford made specific reference, 203(A), does not mention handcuffing. Moreover, in response to questions from Ms. Justice's counsel, Corporal Watford agreed that the headings of section 7-2 and its subsection 203(A) both reflect that they apply only to "prisoners," and he could not point to any language indicating, or even suggesting, that someone whose car has been impounded qualifies as a "prisoner." Instead, he testified that subsequent provisions reference entirely unrelated circumstances, like strip and body cavity searches, which understandably would apply to prisoners. Moreover, in response to follow up questions

_____

(…continued)

based on the evidence, including the video evidence showing her protected position relative to vehicles on the highway. Specifically, the jury could have concluded that Ms. Justice and Carter were in a place of safety while behind the Jersey barrier. It was clear that they were standing at some distance from oncoming traffic and that both the shoulder area to the right of the driving lane and the concrete barrier separated them from the hazards of the highway. The jury could have likewise concluded that they would have been in that location for a brief period of time since the private transportation, arranged at Trooper Lombardo's suggestion, would momentarily arrive. This is what actually occurred.

by the trial court regarding Corporal Watford's contention that anyone placed in a patrol car is a "prisoner" subject to handcuffing, Corporal Watford admitted that this statement was overbroad, as not all individuals transported in patrol cars (e.g., victims of crime) are handcuffed. Based upon this testimony, the jury was free to disregard Corporal Watford's assertion that section 7-2 of the FRM authorized Trooper Lombardo to handcuff Ms. Justice to transport her in the back of a patrol car. Indeed, it was within the jury's province to conclude that section 7-2 of the FRM had no application in the vehicle impoundment context and that, accordingly, Ms. Justice was not a "prisoner" who could be subjected to handcuffing by Trooper Lombardo. Moreover, because Corporal Watford did not reference any other provision of the FRM to support Ms. Justice's handcuffing, and because he testified that the FRM was a comprehensive compilation of all of the PSP's policies,[18] the jury could have further concluded that no PSP policy authorized Trooper Lombardo's actions.

In sum, Trooper Lombardo offered testimony and documentary evidence of authorized conduct in the scope of his employment. Although unauthorized conduct, including the intentional use of force, may still be within the scope of employment in certain circumstances, this question is for the jury to decide based on the evidence presented. Specifically, it was for the jury to determine whether Trooper Lombardo's use of force and handcuffing of Ms. Justice, who the jury was free to conclude was **not** a prisoner and was **not** suspected of any criminal activity, was incidental to authorized conduct and not unexpected by the PSP. Under the facts as established, we hold that it

---

[18] Corporal Watford testified that the FRM "governs all of the rules we abide by." N.T., 3/11/2016, at 180.

was reasonable for the jury to decide that Trooper Lombardo's use of force was outside the scope of his employment.

Furthermore, as noted in our discussion of the Commonwealth Court's erroneous reasoning, the jury was entitled to examine the reasonableness of and motive behind Trooper Lombardo's conduct in deciding whether his use of force fell outside the scope of employment. *See* Restatement (Second) of Agency § 228(1); *see also Lunn v. Boyd*, 169 A.2d 103, 104–05 (Pa. 1961). In fact, absent these crucial determinations, an employee's scope of employment would be potentially limitless. Thus, we have explained that "the fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business. … In such cases, the facts may indicate that the servant is merely using the opportunity [a]fforded by the circumstances to do the harm," and is therefore acting outside the scope of employment. *See Potter Title & Trust Co. v. Knox*, 113 A.2d 549, 53 (Pa. 1955) (quoting Restatement (Second) of Agency § 235, comment c). Moreover, we have said that "if the act of assault, although a means of accomplishing an authorized result, is done for personal reasons or in an outrageous manner, it is not done within the scope of the employment." *Lunn*, 169 A.2d at 104–05. When the evidence is disputed, these determinations are for the jury.

By way of example, in *Brennan*, a child mounted the side of a truck-wagon as it passed him. *Brennan*, 54 A. at 892. In response, the truck's driver, without warning, struck the child's hand with his whip, causing the child to lose his grip on the truck and fall under its wheels. *Id.* Reversing the lower court's entry of nonsuit, we explained that it was for the jury to determine whether the act was within the scope of employment. *Id.*

Although the driver was authorized by his employer to remove trespassers from the truck, and could use necessary force for that purpose, a jury could find that "the purpose of the driver was not to cause the boy to leave the wagon, but to inflict punishment upon him, to gratify the ill will of the driver." *Id.* On such a finding, the tortious act, even though performed while the driver was "in the service of" his employer, would be considered outside the scope of employment because it was "directed against the boy independently of the driver's contract of service, and in no way connected with or necessary for the accomplishment of the purpose for which the driver was employed." *Id.*

Similarly, in *Orr*, Smith, an employee of a detective agency that was hired to guard and protect a pier during a seamen's strike, shot two of the striking seamen after ordering them into his car. *Orr*, 12 A.2d at 26. Orr had approached the car to find out why Smith was ordering other strikers to get into it, even though the seamen were walking away from the pier and the strike at the time. *Id.* A jury returned a verdict in favor of the seaman and against the detective agency, concluding that Smith was operating within the scope of his employment when he shot the seaman such that the detective agency could be held liable for Smith's conduct. *Id.*

Although we recognized that Smith, the shooter, was "overzealous in the performance of the duties for which he was employed, that he abused his authority, was reckless, and inflicted unnecessary injury," we nonetheless concluded that the jury's verdict was sound, and the trial court's denial of JNOV was proper. *Id.* Significantly, however, we observed that the jury's conclusion that Smith was acting within the scope of his employment **was not the only possible inference to draw from the evidence.**

We suggested, for example, that the jury could also have chosen to believe, based on the evidence, that Smith had forced the strikers into the car "because of some grudge or ill-will against him" and that he shot the two men "out of pure malice." *Id.*

*Howard* is illustrative as well. There, a bartender fired his pistol at a patron for making an advance on the woman sitting next to him. *Howard,* 85 A.2d at 402. Explaining that there is no presumption that every act by an employee occurs "in the discharge of a duty owing" to his employer, we noted that "the evidence must show at least circumstances" from which a jury could reasonably infer facts indicating that the conduct was within the scope of employment. *Id.* (quoting *Berryman v. Pennsylvania Railroad Company*, 77 A. 1011 (Pa. 1910)). We concluded in that case that the bartender's duty to his employer to maintain order in the bar did not encompass the use of excessive force to quell what could hardly be characterized as "disorder." *Id.* Thus, the employer could not be vicariously liable for the bartender's conduct because the circumstances "admit[ed] of no other inference than that the act complained of was both willful and separate from duty." *Id.* at 402-03. For this reason, we affirmed the trial court's grant of JNOV in favor of the employer.

As in *Orr* and *Brennan*, it was for the jury to decide whether Trooper Lombardo's conduct was actuated for a purpose to serve the PSP or, instead, out of some personal animus. There was evidence upon which the jury could have relied to conclude the latter. First, although there was testimony that Trooper Lombardo acted as he did to ensure Ms. Justice's safety, and that ensuring her safety was part of his job as a PSP trooper, the evidence also indicated that Trooper Lombardo never tried to remove Carter from the roadside, and never directed him to get into the patrol car. Even

assuming arguendo that using handcuffs to ensure the safety of individuals peacefully awaiting a ride is something Trooper Lombardo is employed to do, the jury could have inferred from the evidence that Trooper Lombardo would have acted to secure Carter as well if Trooper Lombardo were indeed acting in furtherance of those concerns, as opposed to acting out of personal animus.

Similarly, as discussed supra, Trooper Lombardo offered the testimony of a PSP representative that a trooper should not leave a motorist whose vehicle has been towed on the side of the roadway. Notably, this assertion does not take into account the evidence that Ms. Justice specifically refused Trooper Lombardo's "offer" of transportation because, at Trooper Lombardo's suggestion, she had arranged for private transportation. Again, assuming arguendo that the jury believed that Trooper Lombardo would have been irresponsible to leave Ms. Justice on the embankment behind the Jersey barrier, it could nonetheless have concluded that Trooper Lombardo's conduct was outside the scope of his employment because Ms. Justice expressly took responsibility for arranging her safe transport and that she was entitled to do so.[19]

---

[19] On appeal to this Court, Trooper Lombardo contends:

> His insistence that [Ms. Justice] and her stepson get away from the roadside was also intended to serve the [PSP]'s overriding interest in public safety, as was his effort to ensure that they were handcuffed before being driven by him, via police car, to a safer location to wait for their ride (given that [Ms. Justice] had refused to get into [Trooper Lombardo's] car voluntarily. *Cf Commonwealth v. Livingstone*, 174 A.3d 609 (Pa. 2017) ("the role of police is not limited to the detection, investigation, and prevention of criminal activity. Rather, police officers engage in a myriad of activities that ensure the safety and welfare of our Commonwealth's citizens. Indeed we want to encourage such laudable activity").

(continued…)

Second, the jury was free to conclude, upon viewing and hearing Carter's cell phone footage, that Ms. Justice would have struggled to safely cross back over the barrier to get into Trooper Lombardo's car with her hands cuffed behind her back. *See also* N.T., 3/11/2016, at 149-50 (wherein Trooper Lombardo characterizes the concrete barrier as "three, three-and-a-half feet [tall] maybe" and "kind of wide"). Such an inference would further undermine Trooper Lombardo's testimony that his conduct was actuated for the purpose of making Ms. Justice safe.

Third, and perhaps most significantly, on Carter's cellphone video and in testimony, Trooper Lombardo referred to Ms. Justice using language that suggested personal animus. After wrestling her arms into handcuffs behind her back and in response to her calling out in pain and asking him to stop, Trooper Lombardo's response was to tell Ms. Justice to "stop acting like an animal." N.T., 3/11/202016, at 76; *see also* Justice's Exhibit 1. Furthermore, Trooper Lombardo testified that Ms. Justice cursed him "up and down" when she got out of her car and characterized her behavior as "a disgrace, especially coming from a woman," adding that he "was taken back by it." *Id.* at 114. Even if the jury believed that Ms. Justice cursed at Trooper

_____

(…continued)
Lombardo's Brief at 30. Trooper Lombardo's theory of overarching PSP interest in public safety does not address the underlying fact situation presented here: a citizen who is not under arrest, who is not suspected of any criminal activity and who refuses the officer's offer of assistance is forcibly wrestled into handcuffs for the purpose of involuntarily transporting her in an official vehicle to a PSP barracks. There is no attempt to connect the community caretaking doctrine as recognized in *Livingstone* to this scenario and none is readily apparent. Suffice it to say, *Livingstone* does not stand for the proposition that a police officer can force assistance on an unwilling, competent citizen.

Lombardo,[20] it could have reasonably inferred from Trooper Lombardo's comments that his conduct was personally rather than professionally motivated. Further, although Ms. Justice did not request or receive an instruction allowing an inference from the absence of the video footage from the PSP vehicle recorder, the jury was free to recognize that there was not demonstrative real time evidence contrary to Carter's cellphone footage. The jury was likewise free to interpret and draw its own conclusions from the admitted evidence.

Trooper Lombardo argues that "nothing [he] did on the day in question qualifies as legally 'outrageous'," as in *Howard*. Lombardo's Brief at 41. As discussed, unlike in *Howard*, this is not a case that requires (or allows for) resolution as a matter of law. We do not hold that the evidence here "admitted of no inference" other than the jury's. Rather, we hold that it was not determinable, as a matter of law, that Trooper Lombardo's use of force was within the scope of his employment; and there was sufficient, competent evidence, consistent with the law, upon which the jury could find that his conduct was outside the scope of his employment. Although there are cases, such as *Howard*, where we have found conduct so outrageous that it falls outside the scope of employment as a matter of law, we have also allowed a jury to conclude based on the evidence that arguably outrageous conduct was nonetheless within the scope of employment. *See, e.g., Orr*, 12 A.2d at 27; *Pilipovich v. Pittsburgh Coal Co.*, 172 A. 136, 137-38 (Pa. 1934). An appellate court reviewing the denial of JNOV patrols the

---

[20] We note that on the video, following Trooper Lombardo's command to "stop acting like an animal," he can be heard saying "and talk to me. I say get over here, where's your ride. You tell me f -you, f-this. I said get in my car." *See* Justice's Exhibit 1.

outer limits, ensuring only that the jury's determination is supported by sufficient, competent evidence. *See Wenrick*, 564 A.2d at 1246.

As discussed, the Commonwealth Court misstated the law in holding that reasonableness and motive are irrelevant to the scope of employment inquiry in this matter. Both are plainly relevant and, based on this record, reasonable minds could have concluded that Trooper Lombardo's conduct was actuated in such a manner so as to evince entirely personal motives rather than a professional purpose, substantiating further the jury's conclusion that he acted outside the scope of his employment. *See Moure,* 604 A.2d at 1007.[21]

In light of the standards governing scope of employment, it is beyond peradventure that the conflicting evidence adduced at trial presented questions of fact to be resolved by the jury and that various inferences could be drawn from those facts. *See Orr*, 12 A.2d at 27. More to the point, because we must view the evidence in the light most favorable to Ms. Justice, the verdict winner, and give her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences, we conclude that sufficient competent evidence exists upon which the jury could have found that Trooper Lombardo acted outside the scope of employment. We reverse the decision of the Commonwealth Court directing the entry of judgment in favor

---

[21] The Dissent suggests that our decision will "introduce a chilling effect on troopers performing their duties." Dissenting Op. at 7. We are confident that the Dissent's prediction will not ensue from our decision which states the obvious - there are limits to a trooper's scope of employment. Under our civil justice system, when the evidence is conflicting as to the circumstances of an encounter as it was in this case, the question is for the jury to decide.

of Trooper Lombardo and remand to that court to decide the outstanding issues supporting Trooper Lombardo's request for a new trial. *See supra*, note 8.

Chief Justice Saylor and Justices Baer, Todd, Dougherty and Wecht join the opinion.

Justice Dougherty files a concurring opinion in which Justice Todd joins.

Justice Mundy files a dissenting opinion.