# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Harris and Steven Thompson,   :
                      Appellants   :
                             :
             v.            :    No. 169 C.D. 2022
                             :    ARGUED: March 6, 2023
SEPTA Police Detective Daniel   :
Burgmann, SEPTA Police Detective   :
Stewart, SEPTA Police Detective   :
Bacon, and SEPTA Police Detective   :
Bryan McCauley   :

BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE STACY WALLACE, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**                **FILED: May 18, 2023**

In this intentional tort case, Appellants David Harris and Steven Thompson appeal from orders of the Court of Common Pleas of Philadelphia County denying their post-trial motion, and granting in part and denying in part the post-trial motions of Southeastern Pennsylvania Transportation Authority (SEPTA) Police Detectives Daniel Burgmann, Robert Stewart, Edward Bacon, and Bryan McCauley (collectively, Detectives). Specifically, Appellants take issue with the portions of the trial court orders granting Detectives' motion for judgment notwithstanding the verdict (JNOV) with respect to Appellant Harris's claims, and granting Detectives Burgmann, Bacon, and McCauley's motion for a new trial with respect Appellant Thompson's claims. For the reasons that follow, we reverse.

## Background

While the parties profess different versions of the underlying events, the gist of the matter, as asserted by Appellants as verdict winners, is as follows. On July 24, 2017, a man, later identified as Sorrell Groves, assaulted a SEPTA police officer at the Angora train station in Philadelphia. SEPTA police were able to use nearby security camera footage to identify a black Chevy S-10 pick-up truck as Mr. Groves' "getaway" vehicle. SEPTA police subsequently issued a "Be On the Look Out" (BOLO) for a truck fitting this description and increased patrols in the area.

Two days later, on July 26, 2017, Detectives Bacon and Stewart identified a truck purportedly resembling the vehicle from the BOLO – specifically, a black Chevy S-10 – parked across the street from 5811 Cobbs Creek Parkway, Philadelphia. Appellant Thompson owns the house located at this address, which is in close proximity to the Angora train station. After staking out the truck for several hours, Detectives Bacon and Stewart observed an individual, later identified as Appellant Harris, leave the house at 5811 Cobbs Creek Parkway, walk across the street, and approach and access the passenger side of the truck. At that point, Detectives Burgmann and McCauley, as well as numerous officers from SEPTA's Special Operations Response Team (SORT), arrived at the scene to assist.

After Appellant Harris opened the passenger side door of his truck, numerous officers ran up to him with their firearms drawn, jumped on his back, removed him from the vehicle, and handcuffed him. Detectives subsequently searched the portion of the truck that was within Appellant Harris's wingspan and purportedly found crack cocaine and a collapsible baton. While Appellant Harris admits to possessing the baton he has, at all times, denied there were drugs in his vehicle. He was subsequently arrested, taken to the police station and charged with,

among other things, possession with intent to distribute, simple possession, and prohibited offensive weapons, for which he spent approximately 48 hours in police custody until Appellant Thompson was able to post his bail. Appellant Harris suffered injuries to his wrists as well as emotional injuries and distress due to Detectives' actions. Of particular note, in April 2018, following a stipulated trial, Appellant Harris was found not guilty as to all charges stemming from this incident.

After Appellant Harris's arrest, Detectives and SEPTA SORT Sergeant James Zuggi broke into Appellant Thompson's house without a warrant or consent, with their firearms drawn and in full SORT gear. Appellant Thompson, who was approximately 50 years old at the time and disabled, was thrown to the ground and held at gun-point, and an officer knelt on his back. Appellant Thompson and Richard Jenkins, an acquaintance who was there to assist him with remodeling, were both placed in zip-tie restraints and forcibly removed from the house. Numerous officers then searched Appellant Thompson's home, causing damage to doors, floors, and a large safe, and purportedly stealing various items including cash and an expensive watch. Appellant Thompson and Mr. Jenkins remained outside, in restraints until the search of the house was completed. In addition to emotional injury and distress, Appellant Thompson suffered physical injury to his hands and shoulder from having his hands zip-tied behind his back, and Detectives' actions reaggravated injuries he suffered in a previous accident.

No charges were ever filed against Appellant Thompson. Further, Detectives admit that neither of the Appellants were ever considered a suspect in the Angora train station assault. The actual suspect, Mr. Groves, turned himself in to police on the afternoon of July 26, 2017, just a few hours after the above events transpired.

On October 22, 2018, Appellants filed a civil action asserting claims of assault, battery, false arrest, and false imprisonment against each of the Detectives. Appellant Harris also stated a separate claim for malicious prosecution, and Appellant Thompson asserted additional claims for trespass and conversion. Following discovery, Detectives filed a motion for summary judgment on the basis of sovereign immunity which was denied by Judge Charles Cunningham, III, via order without an accompanying opinion. The matter then proceeded to a jury trial over which the Honorable Judge Lori A. Dumas presided.[1]

## Trial Testimony on Behalf of Appellants

During trial, Appellant Harris testified that he was at Appellant Thompson's home on the day in question in order to assist him with remodeling. (Reproduced Record "R.R." at 441a.)[2] He left the house to get his work boots from his vehicle and as he opened the passenger door he noticed something out of the corner of his eye. (*Id.* at 441a-42a.) Appellant Harris turned around and "saw a big gun, [and] a black uniform," noting "I was scared. I thought I was about to get killed." (*Id.* at 442a.) Appellant Harris was thrown into the truck, tackled or "jumped on," and handcuffed. (*Id.* at 442a-43a.) A large number of officers then converged on the scene, swarmed into a circle surrounding him, and began asking him questions and harassing him. (*Id.* at 442a.) The officers told Appellant Harris that he looked like Mr. Groves and made statements such as "[y]ou're the guy," and "give me something, name, [sic] address or you're going to jail." (*Id.*) Appellant

---

[1] After the jury trial in this matter concluded, but before a determination could be issued on the parties' post-trial motions, Judge Dumas was elevated to her position on this Court. Given these facts, Judge Dumas is recused and did not participate in this Court's decision on this matter.

[2] Appellants' Reproduced Record is not paginated with a lowercase "a" following the numbers, pursuant to Pa.R.A.P. (Rule) 2173. This Opinion will cite to the Reproduced Record as provided by Rule 2173.

4

Harris complained to the officers that his handcuffs were too tight, but rather than loosen them, the officers continued to tug on them during questioning, especially when he said something they did not like. (*Id.* at 442a, 444a.) The officers asked where Appellant Harris came from, and he pointed them to Appellant Thompson's home. (*Id.* at 442a.)

Appellant Harris repeatedly testified that all four Detectives were involved in his arrest, that they all physically touched him that day, and that there were "a lot of guns" pointed at him. (R.R. at 442a, 444a, 448a, 547a.) He believes Detective McCauley was the officer who actually handcuffed him, noting that both Detective McCauley and another officer were short "with very long beards[.]" (*Id.* at 442a, 444a, 547a.) A supervisor took Appellant Harris to the police station where Detectives McCauley and Burgmann processed him on the criminal charges. (*Id.*) Both Detectives were also involved in his later criminal proceedings. (*Id.* at 547a.)

Notably, Appellant Harris denied that the vehicle he was driving at the time resembled the truck from the BOLO. (R.R. at 443a-44a, 460a.) He described his vehicle as "[a] 2001 Chevy S[-]10 Blazer, color black," registered to his mother in New Jersey, with a New Jersey inspection sticker on the front and yellow New Jersey license plates on the front and back of the vehicle. (*Id.* at 441a, 444a.) In addition, the molding on the back bumper of his vehicle was "flipped up," and while the windows of his car had only "factory tint," the windows on the vehicle from the BOLO were heavily tinted, to the point that you could not see inside the vehicle. (*Id.* at 444a, 456a.)

Appellant Harris stated that he was scared during this incident as he thought he was about to die, and that he has been paranoid ever since. (*Id.* at 442a, 447a-48a.) When this incident occurred he was trying to gain sole custody of his

young daughter and he was afraid the pending drug charges would damage his custody case. (*Id.* at 445a, 447a.) As for physical pain and suffering, he had pain and numbness in his wrists and hands for several months after the arrest, and he specifically identified Detective McCauley as one of the officers who tugged on his handcuffs in order to inflict more pain during his questioning. (*Id.* at 444a-45a, 447a.) Detectives' actions also aggravated injuries to Appellant Harris's back and shoulder that he suffered in a previous car accident, and interfered with his ability to work. (*Id.* at 447a.) Further, Detectives confiscated his cell phone and impounded his vehicle, and when he finally got his vehicle back it was "stripped" with the dashboard and panels ripped off. (*Id.* at 445a-46a.)

Appellant Thompson testified that at the time of the incident he was in the process of digging out his basement, and Appellant Harris and Mr. Jenkins were there to help with the renovations. (R.R. at 414a.) Appellant Harris left the house to get his work boots from his vehicle and never returned. (*Id.*) Appellant Thompson heard what he thought was someone trying to open his screen door, and then he heard his door "pop" and at least seven or eight officers rushed into his home with guns drawn. (*Id.* at 415a, 421a, 440a, 546a.) Some of the officers ran up the stairs, others ran to the back of the house, and two officers put him on the floor, putting a knee on his back and zip-tying him. (*Id.* at 415a, 545a.) Appellant Thompson explained that he has preexisting injuries as a result of being crushed by a tractor trailer in 2007, and due to his disability he is not able to put his arms behind his back. (*Id.* at 415a.) He was trying not to resist, but the officers forced him to the floor and later lifted him up by his arms to take him outside. (*Id.*) He described the officers as wearing all black with bulletproof vests, patches, and helmets, in "riot gear" with their firearms drawn. (*Id.* at 415a, 421a, 546a.) He was kept zip-tied outside his home

6

for the duration of the search, which was approximately 45 minutes to an hour. (*Id.* at 425a, 426a, 427a.) Appellant Thompson repeatedly stated that no one asked him for consent to search his home prior to entering and he never gave consent. (*Id.* at 415a, 421a, 426a, 440a, 545a.) Rather, after he was restrained and taken outside an officer asked if he had consent to enter the home, to which Appellant Thompson responded "You're already in my home. Why would you ask for permission now?" (*Id.* at 415a.)

Appellant Thompson was not able to specifically identify which officers handcuffed him or brought him outside, noting they were dressed alike and the incident happened very fast. (R.R. at 421a.) However, he repeatedly identified each of the four Detectives as having been inside his house that day. (*Id.* at 421a-25a, 440a, 545a.) In particular, he remembered Detectives Bacon and Stewart being inside with their guns drawn, Detective Stewart guarding his stairwell, and two of the officers having long beards. (*Id.* at 425a, 440a, 545a.) At least one of the officers made derogatory comments to Appellant Thompson, questioning how he had such nice things and using offensive language. (*Id.* at 425a.)

Appellant Thompson testified at length as to the damage done to his property and the items that were taken. (R.R. at 416a-21a, 423a.) He also stated that after the incident he was angry and felt violated, that he has lingering emotional effects including anxiety, and that he feels targeted and does not feel safe in his own home. (*Id.* at 425a, 426a-27a.) He sought help from a psychiatrist for these conditions but the provider did not accept his insurance and he could not afford the fees out-of-pocket. (*Id.* at 426a-27a.) The incident and Appellant Thompson's resulting emotional state caused strain in his relationship with Syrita Wood, his long-term live-in girlfriend, to the point that they separated six months to a year later. (*Id.*

7

at 428a.) Appellant Thompson also incurred costs from retaining a criminal defense lawyer for Appellant Harris and posting his bail. (*Id.* at 427a.)

The testimony of Mr. Jenkins and Ms. Wood is consistent with that of Appellant Thompson. In particular, Mr. Jenkins stated that multiple officers came into the house with guns drawn and zip-tied both himself and Appellant Thompson. (R.R. at 462a-64a.) He emphasized that Appellant Thompson did not give the officers prior permission to enter his home. (*Id.* at 462a-63a.) Afterwards, the house was "a total wreck," with a huge crack in the glass door and couches flipped upside-down. (*Id.* at 463a.) While Ms. Wood was not present when the incident occurred, when she came home from work that day the storm door would not open, the door to the porch was cracked, the safe was open, the floor was scraped, and things were "in disarray." (*Id.* at 466a-67a.) She further noted that Appellant Thompson became very disgruntled and depressed after these events, and this played a major part in their relationship ending. (*Id.* at 467a.)

Two of Appellant Thompson's neighbors, Peter House and Terrence Arthur, also testified. Mr. House saw Appellant Harris walking to his truck when several officers wearing black came up to him with their guns drawn, told him to get out of the truck, and then searched both Appellant Harris and his vehicle. (R.R. at 470a.) After that, the officers went up to Appellant Thompson's house where they first knocked and then went inside. (*Id.*) Mr. House specified that Appellant Thompson was still inside the house when the officers went in and he did not see Appellant Thompson come to the door to speak to the officers. (*Id.* at 470a-71a.) Mr. Arthur lives behind Appellant Thompson and was standing at his kitchen window when he saw four or five SEPTA officers in the alleyway trying to open the fence to Appellant Thompson's backyard. (*Id.* at 472a-73a.) The officers had hand

8

guns on them and two had their guns drawn. (*Id.* at 473a.) Several days later, Mr. Arthur mentioned to Appellant Thompson that he saw SEPTA officers break his fence when they tried to get into his yard. (*Id.* at 472a.) Appellant Thompson informed Mr. Arthur that the officers also broke his front door. (*Id.*)

### Trial Testimony on Behalf of Detectives[3]

Detective Bacon, who at the time was also a medic for SEPTA's criminal investigation division, testified that he and Detective Stewart were staking out a truck similar to the vehicle in the BOLO when they saw Appellant Harris exit a home on Cobbs Creek Parkway and approach the truck. (R.R. at 476a, 483a-87a.) He and Detective Stewart approached Appellant Harris and identified themselves as police officers. (*Id.* at 476a, 487a, 489a.) Detective Bacon admitted to having his gun drawn very briefly during the encounter with Appellant Harris, but claims he quickly re-holstered as he was in a bad tactical position. (*Id.* at 476a-77a, 488a.) He does not know who actually handcuffed Appellant Harris or at what specific point the handcuffs were applied, just that Detective Stewart kept him within the passenger doorway until backup officers arrived. (*Id.* at 477a-78a, 488a-89a.) Detective Bacon identified those backup officers as Detectives Burgmann and McCauley, noting that he did not see either Detective specifically touch or apply handcuffs to Appellant Harris. (*Id.* at 478a, 488a.)

Once the backup officers arrived, Detective Bacon turned his attention to a "commotion" behind him. (R.R. at 478a, 488a-89a.) He turned around and saw Appellant Thompson and several uniformed officers talking in front of the house. Detective Bacon did not see zip ties on Appellant Thompson at any time and he did

---

[3] While we include Detectives' narrative in order to illustrate the entire testimony presented to the jury, we ultimately conclude that the Honorable Judge Joshua Roberts (Successor Judge) erred in not viewing the disputed evidence in a light most favorable to the verdict winners.

9

not see Mr. Jenkins. (*Id.* at 489a-90a.) As the assigned medic, Detective Bacon entered Appellant Thompson's house with approximately six SEPTA SORT officers to look for Mr. Groves. (*Id.* at 490a-91a.) Detective Bacon knew there was no warrant to enter the home and testified that Appellant Thompson consented to the search. (*Id.* at 479a, 489a-91a.) Detective Bacon did not participate in the actual search of the home but merely stood in the living room in case he was needed as a medic. (*Id.* at 490a-91a.) The SORT officers were inside the home for less than five minutes. Detective Bacon did not see officers take any items from the home or damage any property, and he himself did not take or damage anything. (*Id.* at 480a, 490a-92a.) After the search was completed, he rejoined Detective Stewart and by that time Detectives Burgmann and McCauley were gone from the scene. (*Id.* at 492a-93a.) Detective Bacon did not participate in or attend Appellant Harris's criminal proceedings and he never returned to Appellant Thompson's home. (*Id.* at 479a.)

Detective Stewart testified that he and Detective Bacon were doing a grid search in the general area of the Angora station. (R.R. at 499a, 503a.) They spotted a vehicle matching the truck from the BOLO parked on Cobbs Creek Parkway, so they found a parking spot with a direct view of the truck and staked it out for several hours. (*Id.* at 499a, 503a-04a.) When he saw Appellant Harris approach the truck, Detective Stewart exited his vehicle, ran across the street behind Appellant Harris, and announced that he was police. (*Id.* at 499a, 502a, 504a.) Detective Stewart then put his hand on Appellant Harris's back and instructed him to show his hands for safety reasons since Appellant Harris was reaching across the vehicle. (*Id.* at 499a, 504a.) Appellant Harris complied and Detective Stewart then removed him from the vehicle. (*Id.*) One of the officers patted Appellant Harris

10

down for weapons and handcuffed him, and then Detective Stewart escorted him to a nearby park bench. (*Id.* at 499a-500a, 504a.) Detective Stewart repeatedly stated that he did not search Appellant Harris's person or his truck, did not handcuff him or place him under arrest, did not transport him to the station, and did not participate in any criminal proceedings. (*Id.* at 501a, 504a-05a.) Detective Stewart did explain to Appellant Harris that he was being stopped because a SEPTA officer had been assaulted at the Angora station and they believe the suspect made a getaway in a black Chevy S-10, similar to his truck. (*Id.* at 502a, 504a.)

After escorting Appellant Harris to the park bench, Detective Stewart went across the street to Appellant Thompson's house. (R.R. at 502a, 504a.) He had a brief conversation with Appellant Thompson on his front landing, wherein Appellant Thompson stated that he did home repairs. (*Id.* at 504a-05a.) Appellant Thompson was not handcuffed or restrained in any way and he was free to leave the area. (*Id.* at 505a.) While Detective Stewart did not see SORT officers enter the home, he did see them exit within just a few minutes. (*Id.*) Detective Stewart repeatedly testified that he never entered Appellant Thompson's home. (*Id.* at 502a-03a, 505a.) After the SORT officers exited the home, Detectives Stewart and Bacon left the scene and returned to headquarters. (*Id.* at 505a.)

Detective Burgmann testified that in July 2017, he and Detective McCauley were working in plainclothes undercover and that they both probably had beards. (R.R. at 511a-12a, 516a, 519a.) While they were assigned to SEPTA's Special Investigations Unit, they were not specifically investigating the assault on the SEPTA officer. (*Id.* at 519a.) As soon as they reported for work on the day in question, they were alerted that other officers had located a vehicle matching the description in the BOLO and were directed to assist. (*Id.* at 512a-13a, 519a.) The

11

two then drove an unmarked car to the area and parked in a nearby gas station parking lot to await further instructions. (*Id.* at 513a, 520a.)

At some point they were alerted that an individual was approaching the suspect truck so Detectives Burgmann and McCauley drove to the area and parked alongside the vehicle, facing the other direction. (R.R. at 513a, 520a.) When they arrived, Appellant Harris was leaning into the vehicle from the passenger side with Detective Stewart directly behind him. (*Id.*) Neither Detective Burgmann nor Detective McCauley had their guns drawn when they got out of the vehicle, and Detective Burgmann never drew his weapon during the incident. (*Id.* at 513a-14a, 521a.) While there was no actual physical struggle with Appellant Harris he also was not complying with officers' directions to show his hands, and one hand remained underneath him for several seconds. (*Id.* at 513a-15a, 521a.) Eventually officers were able to remove Appellant Harris and escort him away from the vehicle, but he was not under arrest at that point. (*Id.* at 521a-22a.) Detective Burgmann stated that Detective Stewart never "jumped on" Appellant Harris's back. (*Id.* at 522a-23a, 528a.)

Once Detective Burgmann saw there was nothing in Appellant Harris's hands and he was removed from the area, Detective Burgmann went around the front of the truck to the passenger door and immediately searched the area within Appellant Harris's wingspan for weapons so as to ensure everyone's safety at the scene. (R.R. at 514a, 518a, 521a-23a.) Detective Burgmann located a collapsible baton as well as a black bag containing crack cocaine, purportedly packaged for sale. (*Id.* at 514a, 522a-23a, 525a.) The search of the vehicle took only a minute or two, after which it was determined that Appellant Harris would be arrested and charged for the drugs and weapon. (*Id.* at 523a-24a.) Prior to this, Detective Burgmann did

12

not see anyone handcuff Appellant Harris or use any force against him other than removing him from the vehicle. (*Id.* at 524a.) He and Detective McCauley then left the scene and returned to headquarters to complete the paperwork and process Appellant Harris's arrest. (*Id.* at 515a, 524a.) Detective Burgmann claimed he never touched or had his hands on Appellant Harris, and that he never interacted with, touched, or spoke to Appellant Thompson or entered his home. (*Id.* at 516a, 524a, 527a). Detective Burgmann was not a supervisor at the time and did not direct anyone to conduct any activity at the scene. (*Id.* at 524a.) A search warrant was subsequently obtained for Appellant Harris's truck and Detective Burgmann conducted that search, but maintains he did not look in or open any interior compartments and the truck was not damaged during the search. (*Id.* at 526a-27a.)

Detective McCauley's testimony is consistent with that of his partner, Detective Burgmann. Detective McCauley could not recall who handcuffed Appellant Harris, but believed it was either himself or Detective Stewart. (R.R. at 532a-33a, 537a.) He escorted Appellant Harris over to the park bench where he and Detective Stewart remained until the drugs were found and the decision was made to bring criminal charges against Appellant Harris. (*Id.* at 532a, 537a, 538a.) Detective McCauley denied drawing his firearm at any point that day and did not see any other officers with their weapons drawn. (*Id.* at 537a-38a.) Detective McCauley had a very brief interaction with Appellant Thompson when he saw Appellant Thompson walking down the middle of the street and directed him to move for his own safety. (*Id.* at 533a, 539a.) Other than this, he had no contact with Appellant Thompson that day, claiming he was not involved in the search of his home and never entered his home. (*Id.* at 533a, 541a.) Detective McCauley completed some of the paperwork involved in Appellant Harris's arrest and testified

13

at a subsequent suppression hearing. (*Id.* at 534a, 540a-41a.) Within a few days of the incident, Detective McCauley returned to Appellant Thompson's house to provide information on where and how Appellant Harris could retrieve his truck. (*Id.* at 541a-42a.)

Also testifying on behalf of Detectives was Lieutenant Zuggi, commander of SEPTA's SORT unit. At the time of this incident, he was a SORT Sergeant and it was his unit that cleared Appellant Thompson's house in its search for Mr. Groves. (R.R. at 557a.) Lieutenant Zuggi specifically testified that he ordered his SORT officers not to enter the property until he arrived and, to his knowledge, no search of the house occurred prior to his arrival. (*Id.* at 558a.) Captain Reynolds was already at the scene when he arrived and told Lieutenant Zuggi that Appellant Thompson had consented to the search. (*Id.* at 558a-59a.) Lieutenant Zuggi then spoke directly to Appellant Thompson, explaining that they were looking for the suspect in the train station assault and that they were not searching for anything else. (*Id.* at 559a-60a.) Lieutenant Zuggi testified that Appellant Thompson gave him consent to search and that absent consent his officers would not have entered the house without obtaining a warrant. (*Id.* at 560a.)

Lieutenant Zuggi also stated that Detectives McCauley, Burgmann, and Stewart never entered Appellant Thompson's home, and Detective Bacon only did so to observe as the assigned medic. (R.R. at 561a.) Lieutenant Zuggi entered the house immediately after his team to supervise the search and the team cleared the house quickly, within less than five minutes. (*Id.* at 560a.) The officers did not forcibly enter the home, he did not see any damage or hear any reports of damage to the property, and he does not believe there were any civilians inside when they entered. (*Id.* at 560a-61a.) Lieutenant Zuggi further stated that Appellant Thompson

14

was outside prior to the officers entering his home and he was not restrained in any way. (*Id.* at 559a, 561a.)

Several other SEPTA officers also testified on behalf of Detectives. Officer Harry Newell and Officer Brian Zenszer, both of whom were part of the SORT team that entered Appellant Thompson's house that day, testified that no one caused any damage to the property and no one was restrained. Officers Newell and Zenszer further stated that they specifically heard Appellant Thompson give Lieutenant Zuggi permission to search his home.[4]

## Jury Verdict and Post-Trial Motions

The jury returned a verdict in favor of Appellants, awarding them compensatory damages of $290,000 and punitive damages of $305,000, for a total of $595,000. More specifically,

- As to Appellant Harris, the jury found Detective Burgmann liable on all claims (assault, battery, false arrest, false imprisonment, and malicious prosecution).

- As to Appellant Thompson, the jury found Detective Burgmann liable on the claims of assault, battery, false imprisonment, trespass, and conversion, and *not* liable on the claim of false arrest.

- As to Appellant Harris, the jury found Detective Stewart liable on the claims of assault, battery, false imprisonment, and malicious prosecution, and *not* liable on the claim of false arrest.

---

[4] Detectives moved for a directed verdict both at the end of Appellants' case in chief, and at the close of all testimony. Detectives specifically argued that no reasonable jury could determine any of them acted outside the course and scope of their duties as police officers. In addition, they maintained that punitive damages should not be part of the case since Appellants had not raised the issue other than in their complaint and no evidence was presented to support such claims. Both motions were denied in their entirety. (*See* R.R. at 556a, 602a.)

15

- The jury found Detective Stewart acted within the scope of his police duties at all times when interacting with Appellant Thompson and, therefore, he was entitled to sovereign immunity on all of Appellant Thompson's claims.

- As to Appellant Harris, the jury found Detective Bacon liable on the claims of assault, false arrest, false imprisonment, and malicious prosecution, and *not* liable on the claim of battery.

- As to Appellant Thompson, the jury found Detective Bacon liable on the claims of assault, battery, false imprisonment, trespass, and conversion, and *not* liable on the claim of false arrest.

- As to Appellant Harris, the jury found Detective McCauley liable on all claims.

- As to Appellant Thompson, the jury found Detective McCauley liable on the claims of assault, battery, false imprisonment, trespass, and conversion, and *not* liable on the claim of false arrest.

(*See* R.R. at 712a-25a.)

Subsequently, Detectives lodged objections with respect to sovereign immunity and punitive damages, noting they may raise additional objections in their post-trial motions. (R.R. at 648a.) Detectives then filed both a motion for JNOV and a motion for new trial asserting, among other things, that the verdict was inconsistent and that they were entitled to sovereign immunity on all claims because their actions fell within the scope of their employment. (R.R. at 995a-1036a.)

As previously indicated, Judge Dumas was elevated to her position on this Court after the jury trial concluded. Therefore, oral argument on the post-trial motions was heard by the Honorable Judge Joshua Roberts (Successor Judge) on February 4, 2022, and the orders at issue in this appeal were entered on February 16

and 17, 2022, without an accompanying opinion. Those orders (1) denied Appellants' post-trial motion; (2) granted Detectives' motion for JNOV with respect to Appellant Harris; (3) denied Detectives Burgmann, Bacon, and McCauley's motion for JNOV with respect to Appellant Thompson; (4) denied Detectives' motion for a new trial with respect to Appellant Harris; and (5) granted Detectives Burgmann, Bacon, and McCauley's motion for a new trial with respect to Appellant Thompson. (R.R. at 1153a-61a.) The trial court orders left undisturbed the jury's verdicts (1) in favor of Detective Stewart and against Appellant Thompson on all claims (as Appellant Thompson did not move for JNOV or a new trial on his claims against Detective Stewart); and (2) in favor of Detectives Burgmann, Bacon, and McCauley on Appellant Thompson's false arrest claims. (*Id.*)

Successor Judge subsequently issued a lengthy opinion pursuant to Pa.R.A.P. 1925(a) on June 24, 2022. (R.R. at 1182a-1208a.) Therein, Successor Judge explained that he granted Detectives' JNOV motion with respect to Appellant Harris because Detectives were entitled to sovereign immunity on all of his claims. Citing *Justice v. Lombardo*, 208 A.3d 1057 (Pa. 2019), Successor Judge found that there were no disputed facts showing the conduct of any of the Detectives was outside the scope of their duties as police officers. He noted that applying handcuffs is an ordinary, expected part of a detention and that Appellant Harris failed to offer any medical evidence of injury, relying instead on his own subjective claims that the handcuffs were too tight and caused him pain and discomfort. As such, Successor Judge held that the conduct of Detectives in detaining and handcuffing Appellant Harris was objectively reasonable.

Regarding the motion for new trial, Successor Judge determined that the jury's verdict with respect to Detectives' actions towards Appellant Thompson

17

"has no possible reasonable explanation." (R.R. at 1203a.) He stressed that while the jury found only Detective Stewart was entitled to sovereign immunity, there was an absence of any facts distinguishing his conduct from that of the other three Detectives. He further noted that Appellant Thompson's testimony regarding the search of his home and how he was treated was "vague and nonspecific," as he was unable to point to any particular actions taken by any of the individual Detectives, including identifying who physically restrained him or took him outside. (R.R. at 1204a.) Successor Judge indicated that while he was not relying upon Detectives' testimony in his ruling, their statements "cast[] serious doubt on [Appellant] Thompson's overall ability to recollect the actions and placement of specific officers in his house." (R.R. at 1205a.) The fact that the jury found none of the other three Detectives liable on Appellant Thompson's claim of false arrest, but found them liable for assault and battery, merely compounded the inconsistency. As such, Successor Judge granted the motion for a new trial based upon an inconsistent verdict. The appeal to this Court followed.

### Issues

Appellants essentially present three issues on appeal:[5] (1) whether Successor Judge lacked jurisdiction to rule on the parties' post-trial motions and reverse a previous ruling by another judge in this matter; (2) whether Successor Judge abused his discretion by entering JNOV on all claims as to Appellant Harris; and (3) whether Successor Judge abused his discretion by ordering a new trial as to Appellant Thompson's claims because there is no inconsistency in the verdict. Subsumed within these three main issues is Appellants' assertion that Successor Judge erred by not viewing the evidence in light of, and construing all disputed facts

---

[5] Appellants' brief lists 14 separate questions presented. We have reframed and reorganized their issues on appeal for clarity and ease of analysis.

18

and inferences in favor of, Appellants as verdict winners – in other words, by improperly relying on the narrative advanced by Detectives. For all of these reasons, Appellants argue that the jury's verdict should be reinstated.

## Discussion

## Coordinate Jurisdiction Rule

In the first two questions presented in their brief, Appellants assert that Successor Judge "lacked jurisdiction" to rule on the parties' post-trial motions – in other words, that his decision is barred by the coordinate jurisdiction rule. As Detectives point out, however, Appellants failed to raise this issue at the trial court level after learning that the case had been transferred to another jurist. More specifically, Appellants did not assert such an objection in any of their post-trial briefs or by separate motion, and they failed to object during oral argument when Successor Judge specifically addressed the coordinate jurisdiction rule. A party cannot raise an issue for the first time on appeal and, therefore, it appears that this issue has been waived. *See McGuire on behalf of Neidig v. City of Pittsburgh*, 250 A.3d 516, 526 (Pa. Cmwlth. 2021) (noting party "must comply with the general rule to raise an issue at the earliest opportunity") (citations and quotation omitted), *aff'd*, 285 A.3d 887 (Pa. 2022); *Keffer v. Bob Nolan's Auto Serv., Inc.*, 59 A.3d 621, 630 (Pa. Super. 2012) (party's coordinate jurisdiction rule issue waived when first raised in post-trial motion).[6]

Even if Appellants properly preserved this issue for appeal, we hold that the coordinate jurisdiction rule is not implicated here. Generally speaking, "under the coordinate jurisdiction rule, judges of coordinate jurisdiction sitting in the same case should not overrule each other['s] decisions." *Rellick-Smith v. Rellick*,

---

[6] Although not binding, Superior Court decisions are persuasive authority in this Court. *See Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

261 A.3d 506, 513 (Pa. 2021) (quotation omitted). Our Supreme Court has further

explained that

> [w]hen determining whether the coordinate jurisdiction
> rule applies, the court is not guided by whether an opinion
> was issued in support of the initial ruling. *Goldey v. Tr[s.]
> of the Univ. of Pa.*, [] 675 A.2d 264, 267 ([Pa. ]1996).
> Instead, this Court looks to where the rulings occurred in
> the context of the procedural posture of the case. As this
> Court has explained:
>
>> Where the motions differ in kind, as
>> preliminary objections differ from motions
>> for judgment on the pleadings, which differ
>> from motions for summary judgment, a judge
>> ruling on a later motion is not precluded from
>> granting relief although another judge has
>> denied an earlier motion. However, a later
>> motion should not be entertained or granted
>> when a motion of the same kind has
>> previously been denied, unless intervening
>> changes in the facts or the law clearly warrant
>> a new look at the question.
>
> [*Id.*] Thus, in order to determine whether the coordinate
> jurisdiction rule applies [], we must look to the procedural
> posture where the trial judge and the post-trial judge made
> their respective rulings.

*Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 425 (Pa. 1997).

With respect to the procedural posture of this case, Appellants stress

that both Judge Cunningham and Judge Dumas previously ruled on the issue of

sovereign immunity through their respective decisions denying Detectives' motions

for summary judgment and a directed verdict. However, Pennsylvania Rule of Civil

Procedure 227.1 specifically allows for a judge considering the parties' post-trial

motions to order a new trial or grant JNOV. *See* Pa.R.Civ.P. 227.1; *see also Riccio*,

20

705 A.2d at 425. As the Supreme Court determined in *Riccio*, "the fact that a different judge considered the post-trial motions in this case does not affect a party's ability to seek post-trial relief since . . . [Pa.R.Civ.P.] 227.2[7] allows for the substitution of a judge on behalf of an unavailable trial judge, thereby placing the substituted judge in the same position as the trial judge." 705 A.2d at 425 (footnote added). The *Riccio* Court further explained that

> because the post-trial motion process is distinct procedurally from that of rendering a verdict following a non-jury trial and because the considerations of the judge are different at each procedural stage (rendering a verdict at the conclusion of trial versus correcting mistakes made during the earlier trial process), we hold that the coordinate jurisdiction rule does not apply to bar a substituted judge hearing post-trial motions from correcting a mistake made by the trial judge during the trial process. To hold otherwise and not allow a judge deciding post-trial motions to overrule legal errors made during the trial process (whether made by the reviewing judge or another judge who presided over the trial) would render the post-trial motion rules meaningless and the post-trial motion process would become nothing more than an exercise in futility.

*Id.* at 425-26.

_____

[7] Rule 227.2 provides, in pertinent part:

> *All post-trial motions* and other post-trial matters shall be heard and decided by the trial judge unless the trial judge orders that the matter be heard by a court en banc of which the trial judge shall be a member. *If the trial judge for any reason cannot hear the matter, another judge shall be designated to act*.

Pa.R.Civ.P. 227.2 (emphasis added). Appellants' interpretation of Rule 227.2 as requiring that post-trial motions be heard en banc when the initial trial judge becomes unavailable is not supported by the plain language of the rule and lacks merit.

The instant matter is similar to that of *Riccio* as both involve post-trial motions which were decided by a different judge due to the unavailability of the initial trial judge. Moreover, both cases pertain to rulings made at varying procedural junctures. Here, the ruling on Detectives' motion for summary judgment was obviously issued prior to the commencement of trial, based solely on the pretrial record, and both previous rulings were issued before the jury rendered its verdict. Under these circumstances, we reject Appellants' argument that the coordinate jurisdiction rule barred Successor Judge's decision on the post-trial motions. *See Riccio*; *see also Hunter v. City of Phila.*, 80 A.3d 533, 537 (Pa. Cmwlth. 2013) (holding coordinate jurisdiction rule not violated because motions for summary judgment and for nonsuit are not motions of the same kind).

### Detectives' JNOV Motion

Appellants next argue that Successor Judge abused his discretion by granting Detectives' motion for JNOV when he did not see any of the testimony or evidence first-hand, but instead ruled on a "cold" record, essentially usurping the role of the jury and reversing its determinations as to sovereign immunity. They further maintain that Successor Judge erred in stating there were no material facts in dispute as to Appellant Harris's claims and, instead, viewing the facts and making inferences against Appellants, contrary to established precedent.

There are two bases upon which a court may enter JNOV, the first of which

> is where a movant is entitled to judgment as a matter of law because, upon reviewing the record and deciding all factual inferences adverse to the movant, the law nonetheless requires a verdict in his favor. *Moure*[ *v. Raeuchis*], 604 A.2d [1003,] 1007 [(Pa. 1992)]. The second is where "the evidence was such that no two reasonable minds could disagree that the outcome should

22

have been rendered in favor of the movant." *Id.*[]  In such a case, the court reviews the evidentiary record and concludes based on the evidence that a verdict for the movant was beyond peradventure.  [*Id.*]

*Justice*, 208 A.3d at 1069.  Of particular import herein, when "reviewing the lower court's decision, we must read the record in the light most favorable to the verdict winner and afford him the benefit of all reasonable inferences."  *Menkowitz v. Peerless Publ'ns, Inc.*, 211 A.3d 797, 804 (Pa. 2019).  "JNOV is an extreme remedy" which "may not be employed to invade the province of the jury."  *Rohm & Haas Co. v. Cont'l Cas. Co.*, 732 A.2d 1236, 1248 (Pa. Super. 1999).  Rather, "JNOV should only be entered in a clear case with any doubts resolved in favor of the verdict winner."  *Menkowitz*, 211 A.3d at 804.[8]

Here, Successor Judge explained that he granted Detectives' motion for JNOV because "there were no disputed facts showing the conduct of any [Detective] was outside the scope of their duties as police officers" and, therefore, they "are entitled to sovereign immunity as a matter of law[.]"  (R.R. at 1198a, 1196a.)  We disagree.

Pursuant to article I, section 11 of the Pennsylvania Constitution,[9] the General Assembly has declared that "the Commonwealth, and its officials and

---

[8] In *Menkowitz*, 211 A.3d at 804, our Supreme Court further explained that

> [a]n appellate court will reverse the trial court's decision to grant or deny JNOV only when it finds an abuse of discretion or an error of law.  An abuse of discretion does not result from a mere error of judgment.  An abuse of discretion exists where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record.

[9] Pa. Const. art. I, § 11.

23

employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa.C.S. § 2310. It is well established that "SEPTA is a Commonwealth agency for purposes of sovereign immunity," and that this sovereign immunity extends to intentional tort claims. *Ioven v. Nestel*, 150 A.3d 571, 573 (Pa. Cmwlth. 2016); *see also Justice*, 208 A.3d at 1066. Given these principles, Detectives, as employees of SEPTA, "are entitled to the protections of sovereign immunity for conduct within the scope of their duties, subject only to certain exceptions not applicable here." *Justice*, 208 A.3d at 1067. As explained during the jury charge, and outlined on the verdict forms, judgment could only be entered against Detectives in this matter if they were acting outside the scope of their employment during their encounters with Appellants on the day in question.

In *Justice*, our Supreme Court adopted for purposes of sovereign immunity the definition of "scope of employment" provided by the Restatement (Second) of Agency § 228(1) (Am. Law Inst. 1958) (Restatement).

Section 228 of the Restatement provides:

(1) Conduct of [an employee] is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the [employer;] and

24

(d) if force is intentionally used by the [employee] against another, the use of force is not unexpectable by the [employer].

[*Id.*] On the other hand, an employee's conduct "is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.*, § 228(2).

*Justice*, 208 A.3d at 1067. As the *Justice* Court further explained, "whether a particular act of an employee is within the scope of his employment is ordinarily a question of fact for the jury[,]" and "the only exception to this well-established rule is where neither the facts nor the inferences to be drawn from them are in dispute." *Id.* at 1068.

After closely examining the record in this matter, including the extensive and detailed testimony of the parties, we simply cannot agree with Successor Judge's conclusion that "[t]he circumstances leading to [Appellant] Harris's arrest are, in all material ways, undisputed." (R.R. at 1195a.) Moreover, it appears that with respect to the issue of sovereign immunity and whether Detectives were acting within the scope of their employment, Successor Judge erred by adopting the version of events advanced by Detectives, rather than Appellants as verdict winners. *See Menkowitz*.

As recounted above, Appellant Harris testified that numerous officers approached him, with their firearms drawn, and proceeded to jump on his back and handcuff him. The officers swarmed around him, shouting questions and accusations and pulling on his handcuffs, inflicting pain. Mr. House's testimony corroborates this account, as he stated that numerous officers approached Appellant Harris with their guns drawn. Appellant Harris also adamantly denied having any

25

drugs in his truck and he was ultimately found not guilty of all criminal charges.[10] In addition, he disputed Detectives' assertion that his vehicle resembled that in the BOLO, pointing out several differences between the two vehicles and calling into question the propriety of the initial stop. Finally, Appellant Harris explicitly identified each of the Detectives as having taken part in his arrest and having physically put their hands on him that day. Many of these facts are either absent from or downplayed in Successor Judge's Pa.R.A.P. 1925(a) Opinion, which is contrary to our mandate to view the record in the light most favorable to Appellants as verdict winners. While Detectives denied Appellants' version of events at trial, this merely reinforces our determination that Successor Judge improperly invaded the province of the jury since motions for JNOV are only appropriate "where neither the facts nor the inferences to be drawn from them are in dispute." *Justice*, 208 A.3d at 1068; *id.* at 1073 ("When the evidence is disputed, these determinations [as to scope of employment] are for the jury.").

Simply put, whether the officers acted within the scope of their authority is a highly fact-specific determination, subject to the jury's wide authority to find facts and judge witnesses' credibility. *See, e.g.*, *McMichael v. McMichael*, 241 A.3d 582, 590 (Pa. 2020) ("it is the province of the jury to assess the worth of all testimony presented, and the jury is free to believe all, some, or none of the

---

[10] Detectives take issue with Appellants' argument throughout their brief to this Court that the drugs were "planted" in Appellant Harris's vehicle, noting that Judge Dumas granted Detectives' motion in limine in this regard and precluded any reference or statement by Appellants' counsel at trial that Detectives "planted" the drugs. (*See* Original Record at 627.) However, the only logical inference from Appellant Harris's testimony that he did not have drugs in his vehicle and his subsequent acquittal is that the drugs ended up there by some improper means. Given the deference we are required to afford Appellants as verdict winners – with respect to both the facts and any inferences therefrom – we find it was not inappropriate for Appellants to include this argument in their brief.

witness testimony presented at trial").  Here, "the scope of employment inquiry was properly put to the jury" and because its determinations were "reasonably inferable from the facts," Successor Judge erred in disturbing the verdict as to Appellant Harris's claims.  *Justice*, 208 A.3d at 1060.

### Detectives' Motion for a New Trial

Appellants further argue that Successor Judge erred in ordering a new trial in relation to Appellant Thompson's claims because "[t]here are no inconsistencies in the [v]erdict and any perceived inconsistency can be easily explained without the extreme . . . measures taken by" Successor Judge.  Appellants' Br. at 27.  They maintain that Successor Judge really conducted a weight of the evidence evaluation under the guise of an inconsistent verdict, and that he erred by viewing the facts and making conclusions in favor of Detectives.  Again, we agree.

It is true that "where a verdict is inconsistent, a new trial is imperative." *Thompson v. Iannuzzi*, 169 A.2d 777, 779 (Pa. 1961).  Yet this is tempered by the principle that "consistency will be presumed unless there is *no reasonable theory* to support the jury's verdict."  *Beyrand v. Kelly*, 253 A.2d 269, 270 (Pa. 1969) (emphasis added); *see also McDermott v. Biddle*, 674 A.2d 665, 667 (Pa. 1996) (noting same).  Moreover, "[a] new trial should be granted only where the verdict is so contrary to the evidence as to shock one's sense of justice [and not] where the evidence is conflicting [or] where the trial judge would have reached a different conclusion on the same facts." *Davis v. Mullen*, 773 A.2d 764, 766 (Pa. 2001).  As with a motion for JNOV, in ruling on a motion for new trial, the evidence must be viewed in a light most favorable to the verdict winner. *Dep't of Gen. Servs. v. U.S. Min. Prod. Co.*, 927 A.2d 717, 726 (Pa. Cmwlth. 2007), *aff'd*, 956 A.2d 967 (Pa. 2008).

27

In the instant matter, Successor Judge indicated that his finding of inconsistency was based, in part, on the fact that the jury only afforded sovereign immunity to one of the four Detectives, namely Detective Stewart. As Successor Judge further expounded: "The jury did not find any of the other D[etectives] were immune from liability, despite the absence of any facts distinguishing the conduct of Detective Stewart from the other three D[etectives.]" (R.R. at 1203a.) This conclusion, however, overlooks the fact that Detective Stewart testified he never entered Appellant Thompson's house on the day in question. If the jury believed this statement, as it must have, this necessarily would mean that Detective Stewart did not participate in Appellant Thompson's detention or the search of his home, the actions which form the basis of his claims. As fact finder, the jury was free to believe Detective Stewart's testimony in this regard, even if it discounted his testimony in other respects, including his recitation of the events surrounding Appellant Harris's arrest. *See Dep't of Gen. Servs.*, 927 A.2d at 726 (noting "credibility determinations are within the sole province of the jury" and "a jury may believe all, part[,] or none of the evidence presented"); *McMichael*, 241 A.3d at 590 (same). Such a credibility determination would account for the jury's finding that Detective Stewart was entitled to sovereign immunity on Appellant Thompson's claims and, therefore, we discern no inconsistency in this regard.

Successor Judge further opined that the verdict was inconsistent because the jury found none of the Detectives liable on Appellant Thompson's false arrest claim, but *did* find them liable on his claims for assault and battery. Again, there is no patent inconsistency here as the elements of these intentional torts are not coextensive. "Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault

28

is actually done, though in ever so small a degree, upon the person." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) [quoting *Cohen v. Lit Brothers*, 70 A.2d 419, 421 (Pa. Super. 1950)]. In contrast, false arrest is defined as "(1) the detention of another person (2) that is unlawful." *Alleyne v. Pirrone*, 180 A.3d 524, 543 (Pa. Cmwlth. 2018) (quotation omitted). The jury, as trier of fact, was free to determine that Detectives' actions constituted an assault and battery upon Appellant Thompson, but not an unlawful detention. In short, the jury's verdict appears to be a product of their specific credibility determinations and is within the realm of reason. While Successor Judge might have reached a different conclusion on the same facts, he also issued his decision based upon a "cold" record, unaided "by an on-the-scene evaluation of the evidence." *Armbruster v. Horowitz*, 813 A.2d 698, 703 (Pa. 2002). We therefore hold that it was error to vacate the jury's verdicts and order a new trial as to Appellant Thompson's claims.[11]

### Conclusion

For the foregoing reasons, we reverse the trial court orders to the extent they grant Detectives' post-trial motions and remand the record with directions to record the jury verdicts.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita


Judge Dumas did not participate on the decision for this case.

---

[11] Given our disposition, we need not reach Appellants' remaining issues.

29

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Harris and Steven Thompson, :
                            Appellants :
 :
                  v. : No. 169 C.D. 2022
 :
SEPTA Police Detective Daniel :
Burgmann, SEPTA Police Detective :
Stewart, SEPTA Police Detective :
Bacon, and SEPTA Police Detective :
Bryan McCauley :

# **O R D E R**

AND NOW, this 18th day of May, 2023, the orders of the Court of Common Pleas of Philadelphia County in the above-captioned matter are hereby REVERSED insofar as they granted Appellees' post-trial motions. This matter is remanded with directions to record the jury verdicts.

Jurisdiction relinquished.

 

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita